THOMAS J. MILLER *v.* JAMES A. MILLER'S DEVISEES ET AL.

**Bills and Notes—Statute of Limitations.**

> A note, payable at some future time, depending on a contingency, is held not to be due until the happening thereof (though it may read on the face of same, "payable one day after date"), and the limitations would begin to run, from such due date.

**Same—Consideration.**

> The execution and delivery of a new note, to off-set one previously given, will carry all the safeguards as to a valuable consideration that the old note had, through the payee be a different person.

**Same.**

> A note, providing "not to be paid in money, but land at my death," wil not carry interest until that contingency happens.

APPEAL FROM BOURBON CIRCUIT COURT.

February 3, 1870.

OPINION OF THE COURT BY JUDGE HARDIN:

The decedent, James A. Miller, executed his note for $6112.62, payable to his brother Thomas J. Miller one day thereafter, and dated June 20, 1841.

Upon the back of this note is this endorsement:

> "The within note is not to be paid in money but in land after the death of James A. Miller. Given under my hand this 15 July, 1841,
>
> attest                    Thomas J. Miller."
>              her
>     Minerva X Myers."
>              mark

James A. Miller died testate some time in the year 1866 and previous to November 5, as his will was then admitted to record. By it he devised his whole estate to his surviving wife and collateral kindred having no descendants.

Thomas J. Miller brought this suit to recover on said note

against the personal representatives and devisees of said testator in September, 1867.

They set up for defense the statutory bar by time and no consideration for the note.

It is neither alleged nor attempted to be proved that the signature to the note is not that of testator. The subscribing witness, Mrs. Myers, being the sister of the obligor and obligee to the note, is dead. Her husband, however, proves that she attested the endorsement an said note at his house in the presence of the two brothers and at their instance.

That James on various occasions afterwards stated that he owed his brother Thomas J. Miller is established by several witnesses. The two Shropshires, father and son, prove that in a trade of land between father and Thomas J. Miller, in which the latter was to pay a considerable amount as boot, he would not make the trade without his brother James' approval, and that the two brothers came and looked at the land and James approved it, and the trade was closed; this was in the year 1858; that on that occasion James' indebtedness to Thomas was spoken of as being over $6000, and that the note was then taken out, and they saw it, and the younger Shropshire having his attention directed to the subject, spoke of the endorsement on the back, and that his recollection was the note was not to be paid until James' death.

Giving credit to these witnesses, the legal effect of this note and endorsement, taken together, would be that James promised to pay Thomas upwards of six thousand dollars in land at his death, and consequently it was payable at a future time, depending on a contingency, and until the happening thereof it was not due; therefore, the statutory bar of fifteen years has nothing to do with the case.

It was manifest from all the evidence in the case that Thomas J. Miller never had six thousand dollars of his own means which he could loan to his brother James, for within ten days of the date of this note he mortgaged his house and lot in Claysville to secure some thirteen hundred dollars payable in two equal annual installments, and was all the time borrowing money, and officers frequently had execution against him, though he was an energetic and rather thrifty, accumulating man.

But another solution of this transaction is to be found in the evidence of another brother, W. H. Miller, who state that previous

to the date of this note his mother had inherited from a collateral relative seven or eight thousand dollars, and that she loaned to James A. Miller six thousand dollars, with which he purchased his farm near Paris; that his mother had endorsed largely for another brother, who had failed, and all her property was likely to be swept from her; that in this emergency she appointed Thomas J. Miller her agent and handed over to him this note on James A. Miller, and to secure it from the mother's creditors, James executed this note to Thomas; but he says James subsequently paid it to his mother, and kept the items of payment on a book, which, however, is not produced nor proved.

Whatever may have been the motive of the mother in transferring this note to Thomas, the consideration of it was valuable and wholly uncontaminated with any vice; hence obligatory on James; nor could he assail the consideration of its transfer; therefore, when he executed this note to Thomas, in consideration thereof, the consideration for it was likewise valuable and without vice, and the note obligatory on him.

The evidence of its payment is not sustained, though attempted to be established by W. H. Miller and the circumstances of the contract and rescission thereof spoken of by Williams and Davis. But this evidence of payment is overcome, not only by the possession of the note, but the frequent acknowledgment by James of this indebtedness through a series of years.

The contract and rescission testified to by Williams and Davis rather confirm than contradict this indebtedness.

The rescinded contract alluded to by them was a written covenant dated April 26, 1856, in which James was to surrender his farm and stock to Thomas, who was to carry it on and pay James one-half the annual profits during the joint lives of himself and wife, and then one-fourth to her, should she survive him; and Thomas' children or heirs were bound to carry out said contract should he die before his brother, and at James' death, after some other sums to be paid and covenants, Thomas and his children and the descendants of such as might be dead were to have all his property. This arrangement was sorely condemned by James' wife, whereupon the brothers, a few days afterwards, rescinded the contract, as stated by both James and Thomas to said attorneys Williams and Davis.

And another writing, dated November 1, 1856, signed by both

James and Thomas, and witnessed by Mrs. Myers, is produced, in which all that part of the first covenant by which James was to surrender to Thomas the possession of his property, and Thomas was to take it, and manage it, and pay half the profits to James during his and his wife's joint lives, and then one-fourth to her for life, should she survive her husband, is rescinded, but the remainder left in full force. This writing signed by both brothers is filed as an exhibit, in plaintiff's petition, and no affidavit controverting its genuineness is filed.

August 4, 1849, James A. Miller also made a will in which, after providing for the payment of his debts, he bequeathed all his property to his wife for life, made some specific bequests to others to be paid at her death, and left all his estate to his brother Thomas. The written contract entered into April 26, 1856, was rescinded in whole or part within a very few days after its date.

The writing evidencing how far and to what extent rescinded is dated November 1, thereafter, but the acknowledgement of the debt and the existence of the note, is proven as late as the autumn of 1858, two years thereafter, by the Shropshires.

That James and Thomas paid their mother along as she needed it small sums until her death is more than probable.

There is a perceivable motive for this transaction between these brothers. James had no children, and was on intimate terms with his brother Thomas, and they frequently advised with each other as to their business. He did not desire to be harrassed and have to raise this six thousand dollars, and Thomas had the control of it, whether he was or not its beneficial owner. James, therefore, was glad to make the arrangement to pay it in land at his death, and really intended to do so, as is indicated by his will of 1849, the contract of April, 1856, and the subsequent one of November, 1856, and the endorsement on the note.

As this note was for money loaned by their mother, and as by this arrangement Thomas would become the sole beneficiary, and any discontent by the mother during her life would break up this mutually beneficial arrangement between these brothers, she was kept satisfied by such advances as she needed from time to time by them.

Thomas having removed to Iowa several years before James' death, and thereby withdrawing his presence and influence from James, who had grown somewhat dissipated, and being surrounded

by other influences, it was not wonderful that his mind underwent a change, and his first will revoked by one made near the close of his life, amid these different surroundings.

It is evident to our minds that this debt had its inception in a loan by his mother to James, and that he has never paid and discharged it, but still owes the debt; that the payments made by him, if any, did not exceed the interest up to his mother's death, and which may have been part of the consideration for said endorsement on the note, rather the promise to pay it.

As Thomas agreed to receive land at James' death, he can recover no interest, but must be content with the principal sum, which he has the right to recover, whatever may be his relation to the other heirs of his mother as to the fund when recovered.

Wherefore, the judgment is reversed, with directions to sustain Thomas J. Miller's petition, and to adjudge to him the principal sum in said note without interest up to James's death, and interest thereon since his death.

*Beck, Turney, Rodman,* for appellant.

*Prall, Davis,* for appellees.